Good morning. May it please the Court, my name is Barry Sullivan of Stevenson, Quisto, and Coleman, representing Cedars-Sinai Medical Center, the appellant in this case. We brought this action simply to get paid for the hospital services. There was an old lawyer back in East L.A. named Barry Sullivan. That's right, Your Honor. I've run into a few judges who remembered him in downtown L.A. who were rather fond of him. And I've noticed that his name pops up in a lot more appellate cases than my name has so far. So he apparently had a very distinguished practice from about 1930 to about 1960, 65 or so, as I understand it. So he got elected, did he? I don't know if he got elected to elective office. I don't know that. But I do know that there's another Barry Sullivan who was a famous actor. Well, he was running for Justice of the Peace in City Terrace. Well, I shouldn't tell you then that the Justice of the Peace is my uncle, Ed Sullivan. It's a different Sullivan, but we seem to get around. Yeah, okay. You never know. You could have been Barry's grandson. I would have taken that as an honor, Your Honor. We represent Cedars-Sinai, and we're here simply because we brought a state court action initially to collect money owed under a state common law contract from our opponents here, the Postal Benefits Plan. We have a separate contract with them, and that was alleged in the complaint. Can I ask you a question? Sure. I think you might have just answered it. You plead that you have a separate contract. Correct. And you seem to plead that anyway. It's a little unusual for a contracting party to plead on information and belief that they have a written contract with another party. A little strange to plead that on information and belief. Never mind that the thing is you claim that you do have a separate contract. We do have a separate contract. And you certainly pled that. I agree that it's watered down a bit with the information and belief, but I think in a later paragraph we hit the nail on the head from a certainty standpoint, and that would be paragraph 21. Yes. Where we say that in each claim, CEDA is complied with its contractual duties in submitting claims to PBP, the Postal Benefits Plan. So that's what this case turns on. You say we've got a separate contract, we've got a separate contract, and therefore the federal employees, whatever, doesn't apply, correct? Correct. Whatever they have between their employees, their beneficiaries, is their business. That's it in a nutshell, right? If you're right about that, you win, right? You're right, Your Honor. Do you stand in the stead of the patient? No. But you're not entitled to any more than what the patient would get reimbursed for, I suppose, would you? That's incorrect, Your Honor. Oh, you do? And the reason is we have a separate contract with those people, those people being our esteemed opponents, and that contract is what governs our arrangement. If, for example, Your Honor, to give an example of a situation which comes up occasionally in our practice, let's say a health plan doesn't cover a certain kind of operation, and we call up ahead of time and say, listen, we're going to be operating for this particular operation on this particular patient. Will you pay? And if you do pay, it will be according to our contract, a separate written agreement that was separately entered into between the hospital and health plan. And the information we get back in that query is, yeah, sure, we'll pay. We go and do the operation. I would put it to you, Your Honor, that in that situation, the beneficiary is getting more benefits than they bargained for, but we're getting only the benefits that we bargained for in our separate contract with the other bargaining party in this arrangement. And it seems to me, Your Honor, there's two analytical threads that we can hang our hats on here. One analytical thread is if we stand in the patient's shoes and pursue claims based as an assignee of whatever the patient had. So you're not that? We're not doing that. You're exactly right, Your Honor. We're separately suing under a separate contract, purely state law, state common law contract that's been separately entered into, much as what was described in that Blue Cross case that we mentioned in our reply brief, where Blue Cross says, or I'm sorry, the Ninth Circuit describes the relationship in quite clear terms, where it says Blue Cross entered into separate provider agreements with various hospitals. If the plan doesn't pay, does that mean that the patient has to pay? That's a separate issue, Your Honor. We personally, in our firm, we don't pursue patients. We just pursue health plans for health plan benefit under contracts that we have with the health plans. Okay. So if the patient isn't reimbursed by the plan, you don't go after the patient to say, you owe us this much money? Your Honor, I can't speak for the hospitals beyond what they assign to us. I know that we don't. Now, Your Honor, I will say this. If we had sued the patient and then the patient had brought in the health plan perhaps, that might present a separate analytical thread where it would appear that the patient has a right to say, well, my ERISA plan or my FEBA protected plan is at issue. If that's not what we're doing here, again, we are suing under our separate agreement, much as the Blue Cross prudent buyer plan was at issue in the Blue Cross case, which is a separate agreement between the hospitals and the payers, and that's what we're suing on. So whether you can prove that or not is another question, but this is a 12B6. Exactly, Your Honor. And we will concede right up front. We never jump through the procedural, administrative procedure hoops, because we didn't consider this to be a federal claim in the first place, because we were simply suing under our contract that we have with the health plan. Could you proceed through the administrative procedure at all? Not at all, Your Honor. We didn't do that. And so how is that possible, that the court went off on that? You didn't exhaust administrative remedies and so forth? Well, the judge found below that we made no showing whatsoever that we had complied, and that was true. We can't contest that. We aren't. Okay. Are you saying that's an impossibility? I'm not saying it's an impossibility, but I'm saying it would add quite a bit to the burden that we ordinarily have to follow when we make a state common law contract with health plans, and that's not what we envision. It's not what we bargained for. And that's all we're trying to get here is what we bargained for. So I guess the nutshell pretty much describes our point, and I'll submit, and if there's any other questions, I'd be happy to answer them. All right. That's a quick operation, I'd say. Good morning. My name is Michelle Flowers, and I represent the appellee National League of Postmasters United States doing business as PBP Health Plans. I understand that the court has read the briefs and is familiar with the facts. I'd like to move directly to a discussion of several key, a couple of key considerations for the court. But first I would like to respond to what the appellant has discussed in terms of a separate contract. I think, Your Honor, recognize that the complaint is very weak in terms of what it, in terms of what it alleges in terms of a separate contract. First of all, basically all they say is, paragraph 5, that this dispute is covered by a written contract. Paragraph 6, that the participant is covered under the contract with CEDARS. Then it refers later to the contract rate. It refers to the terms of its contract with CEDARS. Well, it turns by the terms of its contract with CEDARS. Exactly. Not somebody else's. Exactly. And this is a pleading, okay? Right, I understand. I understand, but I think it's difficult. Assuming that they properly pled, just for the moment, assuming they properly pled, we don't care about what the employee had or didn't have. We have a separate contract with this company that it will pay us for this service. We have a separate contract, period. They promised to do it separately. Written contract, it says here, okay? That's true. Assuming that's true. Right. I think the difficulty is that we don't know what type of contract this is, and I think it's involved over time. Who cares? We're talking about 12B6. Wait a minute. They're saying they have. They're not saying they have a separate contract with you that you will pay them for this service. That's what they say they have. We're 12B6 land, so we have to assume that's true. I understand that, Your Honor, but I don't think that they say that the contract specifies that we will pay them for this service, and I think the type of contract is relevant because the plan is a FEBA plan. It doesn't enter into contracts that are separate from the payment of benefits. And it's difficult to determine from the allegations exactly what kind of plan this is. I think the complaint is rather vague, and it's kind of evolved over time. I think in the actual, the brief, the appellant's opening brief, there are several different references to provide those to kind of what kind of contract they're claiming, because I think initially they weren't even sure. Page 3, they discuss an agreement between themselves that governs the payment of services rendered. Later they talk about payment, basically an independent contractual obligation of PBP to pay for the care and treatment provided by CEDARS to the patient that was created when PBP represented that the patient was covered under its plan. That's on page 4 and 5. And then later, on page 9, they say they are suing to recover on an independent obligation to pay for the treatment and care that was created when PBP represented to CEDARS that the participant was covered. So I think it's difficult to determine what separate contract they're talking about here. It's only in the reply. I don't know how it's difficult to determine, quote, it's difficult to determine results in a 12B6 dismissal for lack of jurisdiction. That's all I'm asking. I understand what you're saying, and I think I raised that. It's a little mushy. It's a bit mushy as a pleading, but then we, mush is the standard of federal pleading doctrine, so it's mushy. How does that result in a dismissal? It looks like judges didn't give leave to amend. How did that just plain, flat-out result in a dismissal? Well, I think this is their claim in determining what they are seeking here, and we've actually met our burden at the district court level to show preemption, but here is their burden to overcome it. What burden? Their burden is to plead. We've got a contract with these guys, and they breached it. We have a contract with them, not somebody else does, and we're taking an assignment. We have a contract with them, and they breached it. That's what they plead. Well, I think you have to look at the allegations. They don't actually say that this is a separate contract. Obviously, the allegations are weak. They haven't provided a copy of the contract, and they've pleaded it on information and belief. Well, who says that that causes a 12B6 dismissal? Well, I think in this particular case, it's not entirely clear, even if they had such a contract. 12B1. I'm sorry? 12B1, I guess, is what he did. He dismissed it. Well, I think it was a 12B6 motion, and the court found preemption, and then on that basis dismissed it under 12B1 because of the exhaustion of administrative remedies. Yeah, yeah. Okay. But I think even if they have alleged a contract here, I think basically these kind of contracts with a plan are dependent on coverage, and the very issue that they raise, whether the federally contracted rate with them should apply or the Medicare rate should apply, that is an issue based on the patient's death, and it turns on one of the conditions of the plan, which is the death of the patient. How do I know it depends on conditions of the plan when they're saying, we're suing on our separate contract, we're not suing on your stinking plan, we're suing on our separate contract? How do I know that it depends on the conditions of the plan? Well, I mean, I think, you know, here, that's what they're alleging now, but again, their allegations are weak. But even if that's not the case, I mean, I have a couple of points that I'd like to bring up for your consideration. First of all, in terms of the ERISA statutory scheme versus FEBA, I think there's been some question as to whether that's applicable, and we don't dispute that it is, but the ERISA authority in FEBA cases. However, I think there are fundamental policy differences in the two plans that affect whether you look at this contract as an independent contract, whether you look at their negligent misrepresentation claim as an independent claim, or whether these claims are simply another way, an alternative mechanism to get benefits. Should that go to the court for summary judgment once they claim that they have a separate contract? I think here it's not necessary because the very – this is all tied together, and I think even the legislative history of the FEBA regulations and the statutes refer to these type of contracts, provider agreements, and refer to, you know, encourage the carriers that the office of personal management has contracted with to encourage those carriers to make sure, to seek assurances as to – that the conditions of the plan will be followed. So they contemplate these kind of contracts. How do you distinguish this case from the Meadows case here? Well, I think, again, there are certain policy differences between Meadows-involved and ERISA claim, and I think there are certain policy differences that have an impact that have to be taken into account when you're talking about ERISA versus FEBA. First of all, ERISA – the goals are different. ERISA was enacted to create some minimum standards, to provide for disclosures, to give employees access to the federal courts. FEBA, as Botsford says, is basically designed – its main concern is cost savings, and it's administered by one agency, whereas ERISA is administered by the private employer or an independent contractor that the private employer retains. And so there are a couple of concerns that are not present in ERISA cases. When you have one agency created by Congress to administer this plan, uniform administration is of particular importance. Also, as Botsford said, when you are dealing with cost savings as the key issue, then litigation costs are a problem. It increases rates. And also, when you have a – it also – I think the state remedies allow a broader measure of damages, which also increases rates. But didn't Botsford say that ERISA cases are interesting, that it's a similar kind of system, and we can look at ERISA authority for – in describing this system? Oh, exactly, Your Honor. It does, but I think Botsford also talks about the fact that FEBA has a much more expansive application in terms of preemption because of these policy issues, these policy concerns. So – and we don't dispute that ERISA authority is applicable. We just emphasize that those factors have to be taken into account when you're applying that authority. And I think that those policy considerations also provide a context for evaluating the nature of the plaintiff's claims here. And I think, first of all, if you look at the negligent misrepresentation claims, we're not talking about a negligent misrepresentation situation like that in Meadows. In Meadows, the employee – there was no ERISA plan. Neither the provider nor the employee had any connection to the ERISA plan. Here there's a plan in place, and we have the provider going around the statutory scheme that has specifically been constructed in order to pursue state law remedies. Additionally, I think the Meadows policies don't apply in that context. Basically, Meadows, I think, talked about insulating carriers. Here we're not talking about insulating anyone. There's no question that there were payments. The question is the amount of the payments under the plan. I think I have your argument clear. We have a situation, and let's say there is a plan of some kind. And a medical provider comes to the company and says, look, we know that this person is not covered under the terms of your plan. But you know what? We've done a lot of things for you guys in the past. We've been very reasonable. We've done all sorts of things in working with your company, with your company in the past. And we really feel for this particular patient. It would do us a lot of political good. She happens to be the daughter of the mayor of the city. And we would like to cut a separate deal with you. We want to make a contract with you, a written contract, in which you will promise to pay for her care. And we know it's not under the plan, but you'll promise to pay for the care. And you say, fine. And you enter a contract with them to do that. Okay? And now they sue. Okay. Well, I think, first of all, that's not what is alleged here. I said this is a hypothetical. Naturally, it's not what is alleged here. I'm talking about a hypothetical. I'm trying to get the extent of your position. I want to see how far it goes. Okay. Does it go that far? I'm sorry. Again, I understand the hypothetical, but what is the question? Would the plan be required to pay under those circumstances? Well, is it your position that they can say, at their case, they can say, sorry, it's not covered? So there is a written agreement in place and agreeing to pay for the coverage of this person outside the plan. Mm-hmm. I mean, I would say that in those situations, I mean, I would think that there would be certain contracts that were separate enough from the plan that could possibly fall outside FEBA, but I think even in those circumstances, I think, you know, the policy considerations make FEBA broader. And so I think if the plan is implicated at all, which clearly it is in this case because it's included in the complaint, the allegations of the complaint talk about submitting claims for payment under the plan. That was an interesting answer. I think what you said to me is, yes, my position goes that far. They would still be barred. I believe you said that. You said it in a lot more words, but I think that's what you said. Okay. Is that right? I'm sorry. In terms of going as far as to be preemptive? My hypo. Well, your hypothetical, I think, probably would be outside the scope of the plan. Mm-hmm. Okay. And so I think the preemption wouldn't apply in a situation like that. But there are regulations, I think, that govern carriers, FEBA carriers, and so whether that type of contract would be even acceptable, because I think it has to be approved by the Office of Personnel Management and that kind of thing. So I'm not certain that that kind of contract could exist. But I think if it did exist outside the plan, I think certainly there's a strong argument to be made that it is not preempted. Okay. Actually, I had a couple of other points to raise on the negligent misrepresentation. Again, considering those policy factors in determining whether this claim is an independent claim, I think it is distinguishable from MEDOS because there's no plan involved in MEDOS. And here there is a plan involved. There is a plan that has paid, and the issue is related to the payment for this patient for these services under the plan. I'd also like to point out that they haven't really alleged a negligent misrepresentation claim here. They said in their argument that they called and verified coverage and that type of thing, and that's not what they've alleged. They say that for each particular admission, they say that they called to verify that the patient was a member and that we authorized medical services. That's not a misrepresentation. The patient was a member. And in terms of the condition that the payment of benefits turns on, the event that is the problem, the death of the patient, hadn't even occurred at the time these alleged misrepresentations were made. So I think essentially there's no allegations that there were misrepresentations. The broad allegation of false representations is really in conflict with what they're alleging that we did. You know, it's sort of irrelevant, but I'm curious. It seems to me I saw something somewhere in the paperwork that suggested that the reason the patient doesn't get the coverage is the patient happened to die, which seems like an interesting way to have hospitals really give terrific care because if the patient dies on your hands, you don't get paid. But it seems like an unusual insurance provision. I'm just curious. Did I misread that? No, you didn't misread that. I think my understanding is that there is a federal law that requires the provider to accept simply Medicare payments for certain patients in the event of the patient's death. And that is not necessarily covered under the plan. It's provided for in the plan, but it is also, it's provided based on the existence of a federal law requiring it. That's my understanding from the client. I would like to just address briefly the Blue Cross case, which I think the appellant referred to. And the Blue Cross case involved, if I'm referring to the correct case, it involved issues about improper amendment of the fee schedule. And I think these type of contracts generally are referral of patients, you know, provision of the facility's names to the members in exchange for discounted rates. And here, I think in Blue Cross, it was an issue completely separate from the plan because it was dealing with fee schedules rather than whether the contract rates applied at all, which is the case here. And I think all the tests, the remaining claims, the contract claims, all the tests that the courts have relied on really apply in the situations to relate this type of contract to the plan. These kind of contracts depend on the existence of coverage under the plan. Additionally, the claims would not exist without the plan. Another test is whether the place where the appellant is using this as an alternative mechanism of enforcing FEBA. And I think in this case, it's clear that they are. Instead of going through the enforcement scheme that Congress has provided to keep people out of the courts, here you have someone trying to go around that where there's a plan in place. And finally, in terms of the relationship test, whether this impacts the relationship between the parties, the courts have found that the relationship test is met when there is broader coverage, broader benefits than the patient would ordinarily get. And I think the appellants conceded that in their argument. So I think the plan and the contract are intertwined here, and there can't be a separate claim because the contract is subordinate, the contract is dependent on coverage. And I think the district court correctly found that the impact of the patient's death on coverage here is basically a condition that requires an analysis in the terms of the plan. And incidentally, I think the plan, this plan has been terminated, and so it falls to the Office of Personnel Management to administer this plan. So it's all connected to the United States, which is what the FEBA was intended to govern. Additionally, I'd like to point out in the complaint that the appellant seeks interest under a state statute, the Health and Safety Code, Section 1371, which purports to impose time limits on health care plans. And so I think, I guess the interest arises if they don't meet the time limits, the payment of the plans. And, you know, I think clearly that's something that conflicts with Federal law. It imposes restrictions on the health care plan that ordinarily wouldn't be in place. And so I think, as we noted, I think the allegations were vague. They've evolved over time to try to determine what kind of contract they're actually alleging. And I think here, if you look at the complaint, it's clear that they're seeking benefits. And even if you call it artificially damages, I think really what they're seeking here is benefits trying to go around the plan. Do you want to kind of wrap it up? Thank you. Just a couple quick points. I agree the complaint is mush. We never got a chance to amend, though. This was just knocked right out of the box. And so we didn't have a chance to take out what was tailored as a state court complaint, after all, before removal, and tailor it to perhaps some other Federal standards that were out there. But I just want you to know that there was a tangible benefit that the health plan got from the alleged contract. When you look at paragraphs 8, 11, 14, and 17, those paragraphs show what our total charges were for the four different times that this patient was admitted to our hospital. When you look at then paragraphs 9, 12, 15, and 18, those paragraphs show how much money was actually paid by the health plan. And when you add that number, the amount that they paid, plus the amount of underpayment that we've claimed in paragraph 22 of our complaint, where we allege $424,000 of underpayment, when you add up what they paid plus our underpayment, that totals $593,000. But when you look at our total charges, those first paragraphs that I listed, our total charges were $751,000. $593,000 divided by $751,000 shows that that contract gave them a 20% discount from our total bill charges. They received tangible benefit to this separate contract. We will provide services to your members, but you will pay us, but you'll get to pay with a 20% discount. That was the important agreement, tangible consideration that they got for that, and that's in the complaint. Now, I agree the complaint was not pled as artfully as it should have been, but there's enough there to show that there was a contract being pled, and it certainly doesn't say that this thing should be thrown out because there's no possibility of amendment. There is a possibility of amendment, and I think from our arguments here today, you see that that possibility does exist. And at a minimum, the case should be sent back downstairs to allow us to do that amendment, to bring it up to snuff. Did you ask for leave of amendment? Yes, we did. Can we break after this? Absolutely. I guess I would disagree with the characterization of the Botsford case, insofar as it suggests that FEBA and ERISA have different standards with respect to their preemption clauses. Their preemption clauses, as I read Botsford, are co-incident with each other, and therefore I think that the ERISA cases provide really good authority for showing how this FEBA case should be decided as far as preemption is concerned. And with that, I'll depart. Thank you very much. That is submitted, and we're going to take a short recess.
judges: Pregerson, Fernandez, Siler